Our next appeal this morning is the City of Huntington v. Amerisourcebergen Drug Company et al. And the appellate is represented by Mr. Frederick. Mr. Frederick, good to have you with us. Thank you, Judge King, and may it please the court, David Frederick for the City of Huntington and Cabell County, West Virginia. The appellate distributors do not dispute the existence of an opioid crisis in the Huntington community, nor the volume of opioids they supplied to Cabell Huntington or that diversion occurred. The only dispute is whether they were a cause of the opioid crisis and whether that conduct that they committed created a public nuisance actionable under West Virginia law that should be abated. The district court committed a foundational error of law in creating a disagreement with the D.C. Circuit's decision in the Masters case about how the Controlled Substances Act directs the duties of distributors in handling controlled substances subject to the Act and the DEA's regulations. The district court viewed the distributors' duty as only needing to control rogue pharmacies, those pharmacies that were basically fake pharmacies. But in Masters, the D.C. Circuit held that the duty was far broader, that the distributors had a duty to identify suspicious orders, verify whether or not those that the pharmacies were charged to give them. Where does that duty come from, please? It comes from the regulation. CSA? It comes from the Controlled Substances Act, which gives the organic authority of the statutory provisions of Congress, and then the DEA writes the regulations. That's correct, and the regulation is 21 CFR 1301.74B, which we've discussed in our brief. And in that, what the DEA has defined as a suspicious order is one that is of unusual size, that deviates from normal patterns, and is of unusual frequency. And our proof at trial was that the distributors violated that rule because they were continually increasing the orders from pharmacies of thresholds for provision of opioids. And this was happening month after month, to the point where certain pharmacies in Huntington and Cabell were exceeding the national average by orders of magnitude. One or more of the pharmacies were getting 10 times the national average of opioids. Every single distributor was supplying opioids at a rate far higher than the national average. The DEA... For what period of time does this go on? Over a 20-year period, the distributors supplied 80 billion opioid units into Huntington Cabell, a community of about 100,000 people. And so over a 20-year period, we've looked at 40 opioid dosage units per resident, old person, middle-aged person, teen, and small child. And that is where this crisis occurred through oversupply. And the DEA has very specific rules about controlling diversion and making sure that before the suppliers provide these opioids into pharmacies, that there would be a mechanism to ensure that suspicious orders would be stopped and that opioids would not be shipped. And because the district misunderstood, as a matter of law, how the Controlled Substances Act and how the master's decision in the D.C. Circuit interprets the regs to impose a duty on the distributors, it committed an error of law that was foundational on both causation and nuisance. Excuse me, Mr. Frederick. Mr. Frederick, why, in talking about foundational issues in this case, why did you decide or not ask the district court to certify the issue to the West Virginia Supreme Court of Appeals whether, excuse me, a nuisance action would be applicable in a situation like this? Because the court hasn't given clear direction to date. It suggests in a lot of its opinions that the nuisance has to arise from real property, but then it has some very widespread language in other opinions. And so, I'm just curious as to why this isn't an appropriate case for certification on the issue of the availability of public nuisance for a situation such as this. Well, for three reasons, we believe that the West Virginia foundational cases about public nuisance answer the question. They say whether the defendants have created a condition specific to the community. If you're saying that the judge got the public nuisance law wrong. That's correct. Well, wouldn't that be something that they ask the Supreme Court about? You can. What I'm saying, though, is that. No one asked the judge to certify anything. That's correct, because we thought the answer was clear enough based on looking at the question from. They got it wrong. You all disagreed. That's correct. But keep in mind that there are 80 some state cases involving the opioid crisis in the West Virginia Supreme Court. The mass litigation panel has ruled on almost every issue in this appeal. What is there? Seven judges on the mass litigation panel. And they disagree with Judge Faber's. That's correct. That's correct. And important. The Supreme Court has denied writs, discretionary writs in every one of the cases that have gone up, with the exception of one that involved a public nuisance claim where Amerisource Bergen filed a writ of prohibition asking for the application of a 2015 amendment to a comparative fault statute, which the West Virginia Supreme Court denied in that case. But the denials have not been from final judgments. That's correct. As we have in this case. So it's right. So it is not a material distinction. It's not. Well, what I would say is that the point of the federal court in deciding what state law is, is to make what is called an eerie guess. And that is how would the West Virginia Supreme Court. We're very relieved with the eerie. But here, the high court hadn't given us any guidance. We have lower court decisions. And you cite one case, I think, that says we can look at lower court decisions. We believe. There's nothing depth in. Nobody's asked us to certify. You didn't ask Judge Faber, as far as I know, to certify anything. We believe the law is clear. You obviously have the authority and the discretion to certify sua sponte. If you do not think that the law is clear, but based on your position on our position is that you don't need to. But if you want to, we have no objection here. We believe it is, which is contrary to what Judge Faber said the law was. That's correct. And let me tell you why he made an error. What he did, and this is at J.A. 6490, was that he limited public news to public property, where the Supreme Court of West Virginia has had innumerable cases. The test is whether or not there is an unreasonable action with respect to a part of locality. That's the the Supreme Court of appeals in the Duff case specifically said as a general rule, a fair test as to whether a particular use of real property constitutes a nuisance is the reasonableness or unreasonableness of the use of the property. And it was talking about that general rule in 1992 in the Duff case. And so the Supreme Court hasn't really been clear. I mean, in the very case that you cite, they're talking about the general rule regarding particular uses of real property. There have been, though, numerous cases involving products or manners of sale that have involved various types of nuisances. And the point is that the Duff case itself says that even a normal business can give rise to a nuisance if it is done in an unreasonable manner. And the test is whether or not there is a condition that is created, not necessarily that it is limited to property. I will acknowledge that the public nuisance doctrine arose in the context of real property. But the scholar's brief, the amicus brief, points out that even at common law, ancient common law, cases not unlike the ones that we're talking about, they use the example there of apothecaries, which are now called modern day pharmacists, that are involved in creating a public nuisance. So this concept, Judge Keenan, is not one that is limited to property. Twenty-four state Supreme Courts have acknowledged a public nuisance claim in the context of the opioid crisis. Right. And Mr. Frederick, I'm not arguing against you on that. I'm just saying that the opioid crisis has affected everybody in West Virginia. I mean, you know, my family's originally from West Virginia. And I think it's appropriate to have the Supreme Court of Appeals weigh in on this issue rather than have a federal court deciding it. Your Honor, I'll repeat my answer, which is we don't think it's necessary. But if you choose to certify the question, we don't object. We think the answer is very clear on the basis of the cases. If we certify the question, I would ask you and the other lawyers to suggest the questions. Questions, plural. You're talking about it in the singular. But I agree with Judge Keenan. You're not from West Virginia. This is important enough to get it right. And if I could just set aside the nuisance question for the moment to talk about the legal errors that the court committed with respect to causation. I think it's important that any West Virginia Supreme Court of Appeals would also address the idea and an understanding that the district court committed a legal error under West Virginia law by applying what the court called the last wrongful or last negligent act and thereby determined that doctors had broken the chain of causation. That is not the standard under West Virginia law. It is foreseeability and whether the defendants were a substantial factor in causing the public nuisance and whether or not when there are multiple defendants, whether you hold them joint and severally liable because they each contributed to the nuisance. The district court committed an error. This is at 6498 and 6512 of the joint appendix by using this last wrongful act kind of standard when the district court ignored the central causation principle which is foreseeability and the distributors have known at least since the direct sales case. If we find that the district court, I believe he also said that there was no causation. If we find that then this whole issue regarding concurring or intervening is irrelevant, right? I'm sorry I missed the first part of your question. The district court found there was no causation. If we find that we agree with the district court, this whole issue of intervening and concurring is irrelevant, right? Respectfully, you cannot make the finding that there was no causation. The Supreme Court in the direct sales case said that with respect to and that's what occurred here and the other side has conceded that on page eight of their brief that there was diversion here. They call it medicine chest diversion but the point of causation is whether they were a substantial factor in in causing that and we submit that because of their violations of the control. The district court said they weren't, right? The district court made a number of fact findings, Judge Benjamin, that were premised on incorrect statements of law and under the Sarah Lee case, this court is not to give those fact findings deference when they stem from an erroneous interpretation of a legal principle that is controlling and so the correct what's the legal principle that's controlling here that for causation foreseeability and whether the defendants were a substantial factor in causing the nuisance that is the correct legal standard and here since the direct sales case and I do want you to understand this there is foreseeability from anybody. Mr. Frederick, if you could be factual with us not just argue the legal principle what is your best argument factually on the record before us that this was foreseeable as to the distributors? Dr. Keyes, our expert, testified that a massive supply of opioids would create a crisis. Joe Ranazzesi of the DEA testified that distributors would be on knowledge based on the DEA regulations that creating an unlimited supply would create foreseeable diversion risks. Bravosnik says on his testimony that even one percent of the doctors or 1.5 percent of the doctors can create enough addiction that that would create a problem. Here Drs. Webb and Fisher, two of the most rogue doctors in the entire nation, wrote opioid prescriptions totaling 24 million doses out of the 80 million some that are that are provided and so because of the violation of the regulation the fact that the distributors knew and should have known of these rogue doctors who were providing prescriptions to pharmacies that were increasing their monthly purchase orders of opioids it was a foreseeable risk. Okay, but again yes sir but then factually how you say that the doctors were writing these prescriptions how factually is that foreseeable? Well it's very factual because they are filling their orders through pharmacies. The pharmacies were increasing their purchase orders before the doctors wrote their prescriptions in any particular case. The distributors are charged with knowing what their pharmacy customers are doing with respect to these opioids and to ask questions to ensure that the pharmacy is has a legitimate reason for increasing its purchases. Here the evidence at trial showed that the distributors knew that Drs. Webb and Fisher were prescribing through pharmacies that have the largest increases in the opioid dispensing community. How would a court I guess what I'm struggling with here a little bit is how would a court determine what a massive supply is? In other words what what is the burden and the duty and I think this goes back to Judge King's initial question when we kicked off here. How is this applicable in the absence of any specific number? You're just saying on any rational evaluation it should have triggered suspicion? Two things Judge Keenan. One is that the DEA requires that when there are increases in orders the distributors are charged with asking why is this order increasing? That is correct. The regulations. The interpretation. That story provisions you got regulations. That's correct as interpreted authoritatively by the DC circuit in the master's case. And the DEA is supposed to enforce it? The DEA enforces it by getting information from distributors. So when they are in cahoots. Did anybody blame the DEA here? The DEA came in to testify on behalf. I understand that. I'm the DEA. Did anybody blame them for all these problems? Well no because the distributors weren't giving the information to the DEA to enable them to do their jobs properly. Instead looking at suspicious orders. What the distributors instead were doing were working with the pharmacies who wanted to keep increasing their purchases of opioids because there was evidence in the record that the pharmacies were aggressively marketing opioids to the unknown. As your red lights on and you're on my time. As long as you get questions you can go ahead and answer. Thank you your honor. Take care of the other side too. What happened to the rest of your case? You had a you you brought suit against a lot of other people and it was up in Ohio and the in in the when they after they moved it it went to some mass store thing the federal mass store thing in Ohio right? Yes in the multi-district litigation. What happened to the rest of your case and how did it end up back in West Virginia and only against these three distributors? The MDL judge in multi-district litigation will transfer the cases back for trial. This case was selected as a bell that's why they're trapped. We've had some of those. What happened to the rest of your case? The rest of it had suits against more than the distributors. Correct. Did you dismiss them? We've resolved with respect to the manufacturers and the pharmacies. There have been resolutions and that is why the case proceeded only against the distributors. You both would not resolve. And what happened to your jury trial? The parties agreed that because nuisance is an equitable action that it would be a judge trial. The judge asked that it be a bench trial based on the limitation of the claim which the judge asked the parties city of Huntington to limit the claim to a public nuisance claim. Because it was an equitable case? That is my opinion. Because of the abatement stuff? Correct. So you decided that was equity and you weren't in the law side of the court anymore and you didn't have a right to a jury trial? Your honor, I was not part of this. I know and that doesn't help me a bit because you're the only lawyer we got here. I understand Judge King. And you're the only one we got and you're speaking for the Huntington and Cabell County. And I want to know why you didn't get a jury? Your honor, the plaintiffs made the decision when Judge Faber requested that it be a bench trial on the basis of the equitable matters acceded to that request. And so this case proceeded as a bench trial. The abatement remedy is a bench trial type remedy because the nuisance claim sounds in equity. The lawyers understood that that was a proper way to proceed. It was a proper way to proceed? Correct. Okay. So you gave up a jury trial of abatement and asked for a bench trial. Now what happened to your other defenders? Did they settle? Yes. So you got something out of it? Correct. Okay. Which would be set off against any abatement remedy that is to be ordered if we are to prevail in this appeal and have the case go back for re-examination of the record? What, the big pharmacies? Correct. And who else? The big manufacturers. The big manufacturers. And you're the distributors. What, are there like four or five levels for this stuff? Three principally. There's the manufacturer, the Purdue's of the world. They sell to the distributors, the appellees here. I've read some of their stuff. They're the manufacturers of OxyContin. A manufacturer. Correct. There's other manufacturers, McKesson or somebody? McKesson is a distributor, but Endo was a manufacturer. Johnson & Johnson was a manufacturer. Endo was a manufacturer? Correct. Johnson & Johnson was a manufacturer. Yes. And then the three you're showing here are the biggest of the distributors. Correct. And then the next level is pharmacies? Correct. And you had the CVS and Walgreens and Rite Aid. Correct. And small pharmacies too? I don't believe the small pharmacies were sued because the amount of damages that was being sought. You've got a lot of local pharmacies. Correct. That's the ones you call the rogue pharmacies? No, I'm talking about one pharmacy that was- You've got a pharmacy in a small town. The only one they got. I mean, there's small towns that got a pharmacist. That's correct. I'm not talking about the front sole lawyer. I'm talking about the drive-through pharmacy that's in Boone County. That's the kind of rogue pharmacy that I'm talking about. Yes. Not Cabell County. But what I'm talking is an example of the kind that the district court misunderstood the duty under the Controlled Substances Act regulations to look at all of them, whether they were a national pharmacy or whether they were an individual drive-through pharmacy. That's our point. Okay. Anything else? Judge Benjamin? Judge Keenan? No, thank you. Thank you. Thank you very much. Let's see now. Mr. Schmidt? Yes, Your Honor. It's good to have you here. Thank you, Your Honor. It's good to be here. May it please the court, Paul Schmidt for McKesson. The trial court issued five distinct bases for ruling in defendant's favor and plaintiffs must overcome each of the- I apologize to you for mentioning your client. Oh, that's okay. I'm just trying to keep things straight. It's hard. It's a little hard to keep it straight. It's not the only case we got. Yeah, and we've got a really detailed factual record here in terms of the trial record, which is what I'm going to focus on in my argument. I'm going to address causation, and I'm going to make three points, if I may, regarding causation. One is the oversupply allegations we just heard about, which the trial court addressed. There was no evidence of unlimited supply, which is what we heard, and there was no evidence even of their witnesses being able to identify a correct supply level, which was important to the trial court. I'll address diversion and the trial court's finding that defendants here were not responsible for diversion. Those two findings underpinned the trial court's section 6A causation opinion, and then I'll address the remoteness point in 6B. Our core point across all of those rulings is they were all intensely fact-based, and the plaintiffs have given the court no basis to overcome those facts. They can't grapple with those facts, including because in many instances they come from their own witnesses. This is why we have trials to address these kind of factual questions like causation, and the trial court made as ample findings as the trial court could in support of those causation findings, and to be clear, it was the plaintiffs who requested that bench trial. We're not aware of the trial court asking to conduct a bench trial. The plaintiffs requested it to get a quicker trial, and they gave up remedies that would have allowed claims and damages remedies that would have allowed a jury trial. Yes, yes. They amended the complaint? I think they dropped parts of their complaint to focus only on distributors and to waive damages. I don't know if they formally amended their complaint to remove damages, but they waived the damages to have a bench trial, and we agreed to that. And were you in the trial? Yes, Your Honor, the three of us were the lead trial lawyers for each of the defendants at trial. Starting first with oversupply, the core of their case that distributors... I was there during the trial. Yes, Your Honor. Yes. Their core theory was defendants shipped too many pills, that they were responsible for determining the volume of pills. The trial court made directly contrary findings. It was doctors acting in good faith, encouraged by a range of authorities from the DEA to the West Virginia Board of Medicine to prescribe more opioids. And the trial court made specific findings that it was that good faith prescribing and not the improper prescribing we heard about that was not a focus of this trial. It was the good faith prescribing that accounted for the supply, and what distributors did is they matched the supply as their own witnesses conceded were supposed to when there's good faith prescribing without influencing doctors in any way. What's notable about that finding is it was extensively based on concessions from plaintiff's own witnesses. Dr. Keyes, who we heard about, Mr. Renizzisi, who we heard about, their other DEA witnesses, their medical experts right on down the line, their data experts on distribution and prescribing data all conceded that this was driven by doctor decisions. The oversupply that was at the heart of their claim was driven by doctor decisions in terms of setting prescribing levels. That was a to the trial court's section 6A causation ruling. There's no argument it's infected by any kind of legal error. It's largely uncontested, at least in terms of challenging specific factual findings, because it's based on... There was legal error because it didn't apply the right principles of these, what was called the CSA or what? Yes, but that has nothing to do with this oversupply. It was acted on regulations. That applies to the second point, the diversion point. That has nothing to do with oversupply because there's no allegation of a violation when it comes to distributing in response to good faith prescribing. That was critical to the trial court's reasoning in 6A. But then your honor's question, the second basis for the 6A ruling was the trial court's conclusion on diversion. There is no admissible evidence in this case that defendants caused the diversion that resulted in an opioid epidemic. That's JA6511. You had your distributors have obligations under the CSA regs to monitor these things, whatever you call them, the commands. I've seen them. They're written down. Yes, we have obligations to monitor and report suspicious orders. That goes to this diversion point. That's where they allege a legal error. That's doubly wrong because there was no legal error, but also because even if there were a legal error, it didn't impact the trial court's factual findings on this point. In terms of the legal error, the court went in detail through the regulations. It addressed suspicious order monitoring systems. It evaluated in detail the defendant's diligence regarding their pharmacies. It specifically looked at the Masters case from the D.C. Circuit that Appellate Counsel just said it conflicted with, and it followed Masters. Masters said that when distributors failed to conduct diligence on their customers on pharmacies, that was an issue. The trial court applied that standard to the CSA and found that defendants met it. That's why there's no legal error. That legal error separately didn't impact the trial court's factual findings on diversion, and we know that because the trial court told us that itself. At the end of 6A, it discussed the idea of diversion as a matter of fact, and it said expressly whether couched in terms of the CSA or not, there is no admissible evidence in this case that defendants caused diversion that resulted in an opioid epidemic. It looked at their claims of diversion and met them on their own terms, and it found them factually unsupported. That's a core trial court function. The second time you said admissible evidence, does that mean that there was some evidence here that was stricken or that there was inadmissible evidence that got in the record or something? No, I don't think there's been any. I'm talking about the evidence that was admitted. Yes. If it was admitted and it's in the record, it's covered here. Yes, Your Honor, and that's what the trial court judge did. It looked at the one witness they had who came forward and addressed the CSA compliance in this jurisdiction with these defendants, addressed suspicious orders in this jurisdiction. That was Mr. Rafalski, and it found him unpersuasive. What did he do? What's his background? His background is in the DEA, and he came in and he had three broad categories of opinions. He found orders, he said, raised flags for him. The court found that unpersuasive because he didn't even look at the orders. Was he testifying as a DEA representative? No, he was testifying as an expert witness for the plaintiffs. He was an expert witness for the plaintiffs. Yes, Your Honor. He was a former retired DEA person. Yes, Your Honor, and he was the only one they had to testify about diversion in this jurisdiction relating to defendants, and he represented the trial court. He found a basic failure of proof because of things like he purported to identify problematic orders. He couldn't say if they were actually suspicious or legitimate. He used a methodology the court found unpersuasive. He purported to identify diligence concerns that defendants pharmacy customers, but couldn't support that, and actually said he didn't even know if diversion occurred at defendants pharmacy customers. He couldn't even say if they contributed to the opioid crisis. Mr. Schmidt, let me ask you, Your Honor, did the court deal with the fact of the gross disproportion between the national averages and the averages of drugs that were being shipped to these jurisdictions? And secondly, did the court deal with the evidence that the thresholds were continually raised in advance, apparently, at the time it appears that the thresholds were being approached? And how does that factor into your analysis that the judge adequately dealt with this issue? Yes, Your Honor, and I see I'm over time if I may answer the question. You can answer as long as you get questions. Yes, thank you, Your Honor. Your entire time. Okay, thank you, Your Honor. In terms of the allegation about thresholds, there was no evidence that thresholds were increased in advance without getting requests. There was an accusation that in some instances when thresholds were first put in place that companies would go to customers and say you're thresholds, do we need to talk about why you might go over and look at that? And what the trial court judge found regarding those questions, and there are dozens of pages of factual findings on this going through testimony from our witnesses and the plaintiff's witnesses, was that defendants conducted extensive diligence in those circumstances and correspondingly that the plaintiffs, and this was a core set of credibility findings in terms of the defense witnesses. Those are subject to the highest level of deference in terms of this court's review and just a basic failure of proof correspondingly by the plaintiffs. Okay, did the district court deal with the national averages versus the quantities that went into this area? I guess, and the thing that is bothering me, I think you make a good argument on causation, I mean, in many respects. When you have these national averages and you have this overwhelming disproportion in what went into these jurisdictions, you think that was adequately dealt with? Yes, I think it was, and I would point the court to the opinion that appear at JA 6461 and 6462, as well as 6432, where the trial court made specific findings on this very point. It made note of the fact that West Virginia has higher rates of all medication prescribing than the national average. It has the highest per capita average for any kind of medication, and then it made specific findings as to why West Virginia has higher prescribing rates for pain medication. It has a higher prevalence of health conditions that cause pain. It has an older and more disabled population that's likely to use things like cancer, pain treatment, other forms of pain treatment, and it has a job market that has a higher percentage, relatively speaking, of jobs that are more likely to lead to pain in terms of jobs that involve physical labor. It coupled those findings with a corresponding set of findings that I alluded to earlier, that there was no, all of those findings, by the way, were proven through plaintiff's witnesses, with plaintiff's witnesses agreeing with those propositions, so it wasn't even like he picked sides on that issue. He coupled those findings with a set of findings I alluded to earlier, that no witness on the plaintiff's side could say, here's the right level of prescribing. It was up here. It should have been down here. We repeatedly asked their witnesses, how do we know what the right level is? They said, we can't tell you what the right level is. That was important to the trial court. One more thing that is relevant on this issue, and it goes to a suggestion that somehow information wasn't given to the DEA, the trial court had before it evidence that this was all occurring in plain sight. In terms of regular inspections, the court made findings on this by the DEA of the defendants, and in terms of defendants providing every bit of data they had, or every required bit of data in terms of volume of pills, where it was sent, when it was sent, how much was sent to the DEA, so the DEA could not only track this in real time, the defendants relied, I mean, the plaintiffs relied on that evidence in trying to prove their accurate, but the DEA then actually published slices of that data to the public so that the public could see what was happening in real time, and I think that was also important to this idea that there were particular medical needs in West Virginia, and that was known and recognized. I haven't had the chance to address remoteness, the third issue that is relevant on causation, but I know I'm well over time, so we can stand on our paper. I would love to receive some questions on that. I don't know what your reaction is to the question about the certification question. I don't think it's necessary here, given the factual findings and that they provide an independent pathway to affirmance here. That's why we structured our appellate brief the way we did by starting with causation, because those causation findings, particularly the oversupply findings, the diversion findings, there's no question to certify there. Those are heartland factual findings. That's true even as to the remoteness finding, where the remoteness finding was based on a series of factual findings about the vast number of independent actors and the incredibly attenuated time period. The court doesn't need to reach that issue to affirm, so there's no basis, there's no prudential reason to have that certified when the court can prudentially rule on the core causation questions that were at the heart of this trial. You want to go directly to causation? Yes, that's why we structured our brief the way we did. The court's core, remarkably extensive factual findings all feed into those causation rulings. There's no real challenge to the causation findings. They support both remoteness and the Part 6A analysis on oversupply and diversion, and the court can affirm on that basis without reaching nuisance and without needing to certify. There's also factual questions on nuisance that Ms. Monegi will address that the court could affirm on without addressing the core legal question on nuisance. You say it's just not necessary? Yes, Your Honor. Yes, I think it would actually be inconsistent with judicial resources in terms of sending a question to the Supreme Court of Appeals that needn't be reached because we actually submit the law as pretty clear in our favor on that question, but even if the court thought it might be suitable for certification, those causation questions obviate the need for certification. Okay. I do have a question on remoteness, and I realize we're over time, but so if your client's conduct was a substantial factor in bringing about the opioid crisis and the intervening acts were reasonably foreseeable, would you then, I guess, your client's remoteness in the chain of probation, would that absolve them of liability? Yes, I think that's inherent in what proximate cause means. The point of, say, remoteness isn't a distinct element of proximate cause, but proximate means close, remote means far. They're opposites of each other, and that's what the West Virginia case law said. The Webb case said that from the Supreme Court of Appeals said that something that is remote is distinguished from proximate, is not actionable. Metro v. Smith said the same thing. That's the principle underlying employer teamsters in the city of Charleston, and that's a principle that runs through a Supreme Court case law addressing common law proximate cause principles like the Holmes decision. Essentially, there's so many independent causes in between, and the trial court made very specific factual findings on those. Doctors, hundreds. Pharmacists, hundreds. Diverters, thousands. Users of diverted pills, thousands. There's so many independent causes in between over such a broad attenuated period of time that that's remoteness, and the court can rule on that basis as it did without having to undertake a foreseeability analysis because when you have remoteness, you don't need to analyze foreseeability in terms of that factually based number of independent causes and the attenuated time period that operated over. Okay, but Mr. Smith, under West Virginia law, does remoteness answer the issue completely? In other words, there can be more than one proximate cause, and as long as there isn't an efficient intervening cause, remoteness wouldn't necessarily preclude if it still qualifies as a proximate cause. Isn't that correct? I think there are two problems with that argument as plaintiffs make it. One is it doesn't address at all the conclusion in 6A that because of the oversupply findings, because of the diversion findings, the defendants just warrant a proximate cause. That's not a remoteness conclusion, and the remoteness arguments and the foreseeability arguments just don't go to that. That's just a finding that wrongful conduct didn't cause what they say it did, but taking that argument in terms of the 6B section where the judge did rule on remoteness, in that setting, we believe Supreme Court of Appeals law and cases applying both West Virginia law and common law proximate cause principles do recognize that if there is remoteness in terms of a large number of independent causes in between, which the trial court found over a large period of time, which the trial court found, then that obviates the need. Webb versus the Webb case from the Supreme Court of Appeals did not analyze foreseeability. It didn't need to. It made a remoteness finding. The Metro versus Smith case from the Supreme Court of Appeals didn't analyze foreseeability. It made a remoteness finding. Even the cases that the plaintiffs cite on foreseeability underscore this point because they're all really close in time. Someone leaving an unlocked car at the top of a hill that then gets rolled down the hill or car crash cases, they're all so close in time that that's where you don't have remoteness and you go to foreseeability. If you start to get away from that at all, you get a new case like Webb where there's too much remoteness or even a case like the pizza truck case they cite where there was foreseeability as to the pizza truck driver, but not as to the fraternity that housed the building work part that was alleged to have, that they said should have put up signage to warn of the risk at the top of the hill from cars being left unattended. Where there's remoteness, the court doesn't need to grapple with foreseeability. Foreseeability doesn't change the analysis. Here, the trial court actually made findings that are fundamentally inconsistent with foreseeability, but the law says where there's remoteness, the court doesn't separately need to address foreseeability because it's going to change the outcome. Thank you. Thank you, Your Honor. Thank you very much. Respect. Ms. Slodini? Yes, Your Honor. Ina Meneghe for Cardinal Health, and I will be covering nuisance as well as unreasonable interference. So, with respect to some of the court's questions, first, let me start with what the court did here. The court's legal analysis of nuisance law was exactly right pursuant to Fourth Circuit precedent. So, the district court followed Wells v. Liddy and other Fourth Circuit cases' instructions for what, for when exactly the situation occurs. When a state Supreme Court has not spoken, the Fourth Circuit has said that the district court must look to the canons, the restatements, treatises, and to the laws of torts. He looked at treatises and the law of other states, and the third restatement, Comment G, explains that the common law of public nuisance is an inapt vehicle. There's a disagreement between the parties about the restatement references, right? You're correct, Your Honor. I'm going to say the second restatement is the only one that West Virginia's filed, and you all, and Judge Faber, talked about the third restatement. That's correct, Your Honor. We disagree. Our understanding is that the third restatement clarified the second restatement, and when it comes to tort law, West Virginia has followed the restatement for tort law. So, has the West Virginia Supreme Court of Appeals— But it didn't follow the third restatement. I don't think that the West Virginia Supreme Court of Appeals has had an opportunity, Your Honor, yet to apply the third restatement. That is correct, Your Honor, but it is not— they have not rejected the third restatement. Ms. Maneeki, what—do we consider the state trial court decisions? I realize they don't have the precedential effect, certainly, that the Supreme Court of Appeals has, but is that something that we're obligated to consider in terms of predicting what West Virginia's answer would be? Yes, Your Honor. That is one of the litany of items that a district court sitting in diversity needs to consider, and the district court here very much did consider the lower court decisions, and after reviewing 150 years of public nuisance law in West Virginia, came to the conclusion that those lower court opinions were not persuasive that dealt with the opioids issue and were not consistent with West Virginia court on public nuisance. And so, the district court here did exactly what it was supposed to do in that it exercised restraint as a federal court sitting in diversity— That includes the ones from the mass tort group in West Virginia, whatever it's called. They got a group of judges, six or eight judges, that handled the mass tort cases. Yes, Your Honor. The ones that have been— They disagreed with the legal principles that you all sponsored. They did, Your Honor. They did. And Judge, at the time he ruled, any of the mass litigation panel's decisions that existed, he did consider those. He considered all of those, and he considered the writs that had been denied. He disagreed with them. He disagreed with them, Your Honor, and he did what a federal court sitting in diversity needs to do. He should not be the one, this district court should not be the one extending the law of West Virginia for the very first time into a brand new area and a brand new fact pattern. That should come from the West Virginia Supreme Court of Appeals. Well, is that a reason to certify in this case, then? I mean, I understand Mr. Schmidt's argument on causation, but if we consider causation a close issue, what is the reason not to certify? Well, Your Honor, I think that there are four separate and independent grounds here to affirm the district court, the two related to causation, as well as unreasonable interference, which falls under nuisance law, which I'm about to turn to. So, yes, Your Honor, you are correct. We don't need to certify if we can figure out some way to rule with you without certifying. That's correct, Your Honor. Why wouldn't we want to find out what the law is right? I'm sorry, Your Honor? Why wouldn't we want to find out, get the law right, make sure the lower court got the law right in analyzing the case? I think you can certainly certify. That the misapprehension of the law impacts what you say are factual boundaries. Well, Your Honor, I actually, with respect to nuisance, all of the findings that the court made with respect to unreasonable interference. So, even if the nuisance law was as the plaintiffs wanted to be, they would still not be able to sustain a nuisance claim according to this district court because of all the factual findings that this court made with respect to unreasonable interference. And so, even if the law of nuisance was exactly the way they wanted to be, they would not win in this case. And so, for that reason, depending on what this court determines with respect to those findings, for that reason, we don't think it's necessary to certify. And turning to unreasonable interference. If it's unnecessary, do you oppose it? Well, it's unnecessary. I think that the order of events should be, if it were up to me, Your Honor, would be that this court first make a decision as to the four separate bases for affirmance that are fact-based. And if the court finds that there is a basis to uphold the district court opinion as it relates to those separate four fact-based bases, then I don't think it is necessary to bother the West Virginia Supreme Court of Appeals with a certification on this particular issue. The other thing I'll note before I leave public nuisance is that the general law is that the one Supreme Court in the country, state Supreme Court that has analyzed this particular fact pattern, has come out in their favor and in the same direction as the district court here, and that is the Oklahoma Supreme Court. Turning to an outlier. Well, it is the one Supreme Court that has analyzed the issue. So, I think it is the singular one that has looked at the issue, but I disagree that it's a majority of one. It's the majority of one, and the district court certainly analyzed that as well as the lower trial court decisions. With respect to the issue. We do have lower trial court decisions that go the other way. Correct, Your Honor. No question about that. And your colleague there, you did, read a bunch of things you can consider on these eerie things, and one of those is when you don't have a high court decision, you can consider the lower court decision. It is one of the things to be considered, Your Honor. In addition, let me go back to it, Your Honor. All right. Maybe you Liddy, to underscore, says that the district court in this situation should look at canons, restatements, treatises, the law, the lower trial courts, as well as the law of other states. This district court did all of that, and he ultimately found persuasive the third restatement and the Supreme Court of Oklahoma. He did not think that some of the lower court decisions that he reviewed with respect to this particular fact pattern were persuasive, and went again. West Virginia lower court. Correct, Your Honor. But there's this group there that are supposed to be the experts in this mass tort stuff. Judge Mumps, for example, he might be the head of it. The West Virginia litigation panel, the mass tort litigation panel. I know most of them, and I have a lot of respect for every one of them. I practiced law before, but you give the Oklahoma Supreme Court credit, but not those guys. With all due respect, Your Honor, I don't think so. I think the district court here considered all of those decisions, and so he looked at all of the trial court and MLP decisions that were in existence at the time that he ruled, and he felt that the MLP and trial court decisions in West Virginia that had come out the other way were inconsistent with 150 years. Some after he ruled. That's correct. That he didn't consider, but they specifically said we think he's wrong. That's correct, Your Honor. That is absolutely correct, and Your Honor, I realize I am over time. As long as you take questions, as I say, you're all on our time. Thank you, Your Honor. If I may just return back to the issue of the unreasonable interference, which is a fact-based issue. Mr. Frederick said that the CSA, in that he found distributors only needed to look for illegitimate pharmacies, and that is just plainly incorrect. The court quoted exactly what the CSA regulations require. That's at JA6502, and those requirements, as it's relevant to this case, is to design and operate a system to disclose suspicious orders of controlled substances, and to report those suspicious orders. The court then went on to find- I believe his argument, if I'm correct, is that under Masters, that you have to go beyond that, and that the holding in Masters says that that you have to look beyond just the pharmacies. You also have to look at the patients. I was just interested to see what your response is. Absolutely, Your Honor. This court and Masters are absolutely compatible in their interpretation of the CSA. What is different is the fact patterns that each court was dealt with. And so, with respect to- which I can go into, Your Honor, but jumping ahead to your issue of prescribing doctors, the DC Circuit in Masters faulted Masters for doing insufficient investigations of orders placed by pharmacy customers. It did not hold that there was a duty to investigate prescribers as a matter of law. So, there is no obligation in the CSA to go look at your customer's customer and investigate them. It is to examine and investigate the actual orders put in by the pharmacies. And as Your Honor is probably aware from reading the record here, just to illustrate, when a pharmacy puts in an order with a distributor, it is not on a prescription by prescription basis. It is a bulk order. The order may involve thousands of pills, and those pills will go to fill multiple different prescriptions that the pharmacy or the pharmacist receives to get filled. And so, there could not possibly be a duty on the part of the distributor after the pills are out of their custody and control to go investigate what happens to those pills after the district court analyzed here. He found over 34 pages of opinion that the distributor substantially complied with their duties under the CSA to design and operate a suspicious order monitoring system and to report suspicious orders. And he found specifically that the plaintiff failed to prove that any particular order that was shipped was suspicious. They failed to prove that defendants due diligence with respect to suspicious orders was inadequate. He found that they failed to prove that any diversion occurred from defendants pharmacy customers in Cabell Huntington. And he found that the volume of opioids shipped to Cabell Huntington pharmacies, they failed to prove that that volume was unreasonable. Instead, he found that the distributors only shipped as much as doctors prescribed according to the prevailing standard of care. And that was conceded by plaintiff's own experts. I realize I'm well over time, but I'm happy to answer any more questions on nuisance if there are any. We appreciate it. Thank you. Thank you. Commissioner Nicholas. Good afternoon, and may it please the court. My name is Robert Nicholas, and I represent Amerisource Bergen Drug Corporation. Today, I will address abatement, an issue that this court does not need to reach if it affirms the district court's findings on liability as we believe it should. Before the start of trial, the plaintiffs voluntarily waived any right to compensatory damages. They chose instead to pursue only the equitable remedy of abatement. And I will say since Judge King, you asked that my recollection is the same as Mr. Schmitz, that there was no plaintiff's drop any claims or proceed only in equity. That was a decision that was made by the plaintiffs. Based on the trial record that ensued, and it was a very lengthy, fact-intensive trial, the district court concluded that the relief that the plaintiffs were seeking was in fact compensatory damages, and that they were therefore not entitled to that relief. The plaintiffs are asking this court to disregard these extremely well-supported and detailed factual findings, and they are seeking to vastly expand West Virginia nuisance law. The court should decline both invitations. I have just three points to make, and I will be brief. First, and most importantly, the district court concluded that as a factual matter and based on the trial record, the relief that the plaintiffs were seeking was not abatement, because it had no connection to and would not address the defendant's alleged conduct. The purpose of nuisance creating conduct and remove the direct physical manifestation of the nuisance. But here, the plaintiff's supposed abatement plan was not designed to stop or change the way defendants distribute opioids or to remove the alleged oversupply of prescription opioids. Instead, the plaintiffs sought money to address downstream issues related to drug addiction, including medical treatment, needle exchanges, criminal justice initiatives, counseling for first responders, and so on. Those initiatives hundreds of people have been overlooked and by these, right? Well, they're they're they're claiming that that's what they're claiming. Yeah, but yes, that's that's that's not incorrect. That's correct. But they said we want to abate that. They said we want to. Well, they said that what they call abatement. They're calling it abatement. But he's going to be involved in the story damage because the nuisance that they identified was the oversupply of pills. These these things that I just kicked off medical treatment, counseling for first responders, needle exchanges. They're they're totally worthwhile things, but they do not address the nuisance as the plaintiffs are defining it. I'm not even getting into the issue of whether that's whether that you know, whether that's a nuisance or not. I agree with Miss Maggie's position on this, obviously. But but be that as it may, if you just three points you want to make. Yeah, OK. So that on abatement, is that a legal ruling or it's a factual ruling? It's a factual. Absolutely. Because the court looked directly at what they were proposing by, you know, in terms of of remedies. What is it they heard testimony about it and the court compared it directly to the alleged nuisance that that was being put forth. And the judge made a factual determination. No, this does not go to that. And that is, I think, respectfully, is as factual as you can get. Second, the plaintiff's argument about conduct versus conditions is designed to so so confusion, but it is a red herring where there really is no confusion. Abatement has historically focused on stopping the nuisance, creating conduct. But an abatement remedy may include removal or elimination of the direct physical manifestation of a nuisance. I know I'm over time, so I'm going to go. Do you want me to stop? In the case law, this is sometimes. I appreciate it. I'll go. I'll try to last over time. They always take advantage of me. In the case law. The direct physical manifestation of a nuisance is often referred to as a condition, and the examples are, for example, the pollution of a lake in a lake or the physical structure of a used car lot in a residential neighborhood. Those are coextensive with and part and parcel of the nuisance. Obviously, no West Virginia case has ever allowed as abatement the far removed downstream harms that the plaintiffs are seeking here. To do so would be a profound expansion of West Virginia law that would disrupt the boundary between equitable and legal remedies. Last point. Plaintiffs accused the district court in their injunctive relief. That is not correct. To the contrary, the district court has acknowledged the abatement can sometimes include a monetary component, including and the district court noted this in his decision on summary judgment, which we cited in our brief. The district court did not reject the plaintiff's plan because they were seeking money. The district court rejected plaintiff's plan because on the evidence presented at trial, they were very clearly not seeking abatement. They were seeking compensatory damages for downstream harm. The plaintiffs did not establish any entitlement to relief. That conclusion was based on an extensive factual record, and it should not be disturbed. With that, if there are no questions, if there are questions, I'm happy to answer them. Thank you very much. Thank you very much. Thank you for the opportunity. Mr. Frederick, we're back to you. Thank you, Judge King. I want to start with Judge Keenan's questions about causation. The standard under West Virginia law is whether some other cause is an effective intervening cause that breaks the causal chain depends in part on whether it was foreseeable. The district court didn't address the issue of foreseeability, and so therefore it didn't get into the kinds of points that we're trying to make today, which is that in the 1940s, the Supreme Court of the United States said in the direct sales case, if you supply a lot of opioids, you will create a black market. The point they're making here is we're not responsible for the diversion once it leaves our distributor warehouse and goes to a pharmacy. The CSA regulations say that's not correct. The master's decision of the DC circuit says that's not correct. The distributors have an obligation to do due diligence, so when the pharmacies increased their orders as they were doing month after month after month, it was on the distributors not to just willy-nilly provide it, but to ask the question, why do you need it? And the answer would have come back, we need it because doctors Webb and Fisher are prescribing opioids in crazy amounts, millions of dosage unit amounts. And the distributors then would have been obliged to report that to the DEA and to stop the supply of those opioids. That is why what the distributors did here was completely foreseeable. The Congress enacted the Controlled Substances Act to make distributors of controlled substances knowing that if they let these large amounts of opioids out, they would be subject to the CSA regulations. Could you focus or at least come back to the argument that you made, I think, earlier, or at least you made it in your brief, that the district court erred when it focused on suspicious pharmacies instead of suspicious orders. And how does that factor into the causation consideration? They're related, Your Honor, because a suspicious pharmacy will make for the thresholds to be increased. The evidence at trial was that the people who were supposedly doing this due diligence were salespeople who were incentivized to increase the sales because that meant more money for them. And so when you're talking about foreseeability, Judge Keenan, which the district court did not address, you have to look at the evidence from a different prism. My friend says that CSA violations cannot possibly be a problem, but the United States government has sued AmerisourceBurden alleging 14,000 violations of the Controlled Substances Act. How can they reasonably say this is not foreseeable? Okay. So, Mr. Frederick, I think then your best argument on causation is that the volume of drugs made the crisis foreseeable. Is that what you're saying? That's correct. That is a direct line from the Supreme Court's direct sales decision to the enactment of the Controlled Substances Act to, in 2005, the DEA got these distributors in a room and said the numbers are too great. You have to do something about that. And what was the response? It was by the distributors to go to the pharmacies and say, if you need to increase your thresholds, go ahead and do it, but if you do it in advance, it won't be suspicious anymore. And if you look at an exhibit that was at trial called The Matrix, it's this very complex large spreadsheet of all the numbers. By pharmacy, by distributor, the numbers went up and up and up. And so it was no accident that there is this massive addiction problem. They seem to think that the things that they were distributing were like any other product, but they weren't. This is different because what they put into the market were addictive drugs. What about this remoteness argument? Remoteness is not a standard. If you look at the reply brief on pages 33 and 34, Judge Benjamin, we address the Webb and the Humphrey case. What the courts there said is that it's not a remote, if it is not a proximate cause, it was deemed to be remote. It is not an independent element. That was the whole point I started with by their misstatement of West Virginia law. Remoteness is not an element of causation under West Virginia law. They have taken those statements out of context, as we pointed out in the reply brief, and they have misstated it. And even those decisions, Judge Benjamin, talk about foreseeability as the test for causation. So the incorrect application of West Virginia law on causation led the district court to disregard huge swatches of information that was put into the trial record that would have established that the distributors were a that the mass litigation panel has held is a causative factor here. And so when you look at the totality of the situation, 10% of the population of Huntington is addicted to opioids. Judge Keenan, if the oversupply wasn't a contributing factor to that tragedy, it is to know what causation means in the law. Okay. But Mr. Frederick, and I'm just going to push back because I want to make sure I understand this. The district court discussed a volume, though, in its factual findings, how did it become, how did it, from your perspective, infect the legal analysis? Because the factual findings are pretty well protected, you know, absent clear error. So how did it infect the legal funding? Because the district court misunderstood how volume was foreseeable in leading to diversion. That was the legal error. And so as a result, the district court misunderstood that when you increase the volume, you are going to have to deal with what it called the last wrongful act. And because it got the volume foreseeability question wrong, it then compounded that error by getting the approximate cause test as a last wrongful act standard incorrect as well. And based on those two legal errors on causation, the district court misunderstood what was the key evidence in the case. If the Supreme Court of the United States says that putting a large amount of opiates out into the market is going to create a black market, it surely can't be for a district court to say, no, that can't be a causative factor. The district court also erred by saying that the national average was somehow irrelevant based on vague evidence about obesity rates or other conditions. Judge Keenan, you asked that question, but the point of our submission is there was no evidence by the distributors that there was some unique obesity challenge or other chronic health condition in Huntington Cabell that was going to create a problem. That was a binding of facts that was not based on any kind of data. And it certainly wasn't data that justified 10 times more opioids in Cabell Huntington than in the national average. There's simply no basis, no justification for this volume of opioids going into this community when the risks and the hazards are so very, very clear. And they say that the distributors don't have an independent duty to go further in looking at the doctors. Yes, they do. Masters says you have to look at suspicious orders. And so when a 30,000, it's on the distributor to ask why. And the answer that would have come back in the worst of the pharmacies was there are a couple of doctors that are prescribing millions, millions of opioids. And the distributors then would have passed that along and the DEA would have been able to bust them instead of having it take so long. And we know these are rogue doctors. They lost their medical licenses. We know that one of the pharmacies that they dealt with was a rogue pharmacy. It lost its license from the DEA. And so these are not things that are not foreseeable. They are direct causes of the contribution to this massive opioid crisis that this community faces. And we would ask you to appreciate the way that causation should be applying here. And there is no doubt that there is a nuisance that has been created under any standard of flexible standard in which the Supreme Court of West Virginia in looking at Sharon Steele or at the Duff case or at Martin would confine the public nuisance doctrine to something that would not include something that so clearly affects public resources. It affects drug courts. It affects family courts. It affects families who are dealing with addiction problems. And so all of these public resources are part of abatement plan that is designed to reduce addiction. These are treatments that are not about damages. It is about cure. It's about an effort to deal with a crisis that is going to ravage this community for at least another 15 years. And so when we talk about abatement, we are talking about trying to lessen the degree of social harm created by the distributors. Unless the court has any further questions, we will submit. Thank you very much, sir. We will, what I want to say, we really appreciate the arguments. And thank you very much. And we will take the case under advisement. And Judge Benjamin and I will come down and greet the counsel. And Judge Keenan can wave to you. And then I'm going to ask for a brief break. What's up? Okay. So brief recess.
judges: Robert B. King, DeAndrea Gist Benjamin, Barbara Milano Keenan